GEORGE DURGOM and MARIAN DURGOM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Durgom v. Commissioner
Docket No. 7275-71
United States Tax Court
T.C. Memo 1974-58; 1974 Tax Ct. Memo LEXIS 263; 33 T.C.M. (CCH) 276; T.C.M. (RIA) 74058; March 7, 1974, Filed. *263 Held, petitioner-husband, an actors' agent, is entitled to deductions claimed in connection with his ownership and operation of a house in Palm Springs used for client entertainment; his wife's testimony corroborating his statement regarding the business purpose of the entertainment and his business relationship with the persons entertained meets the substantiation requirements of section 274(d) even though a joint return was filed; Held, petitioners are entitled to depreciation on the projection room in their Beverly Hills home; the amount thereof determined; Held, petitioners have failed to prove their entitlement to a deduction for loss on worthlessness of securities. Earl C. Crouter, for the petitioners. Alan R. Herson, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency 1966
$ 3,463.25
1967
5,746.00
1968
4,129.00
$13,338.25
*265 The issues for decision are the following: [1]
1. Whether petitioners are entitled to deduct depreciation and certain expenses (primarily involving maintenance) connected with their ownership and operation of a house in Palm Springs, California, which they allege is an entertainment "facility," and if so, what amount of depreciation and what percentage of those expenses are deductible? 2. Whether petitioners are entitled to deduct depreciation on the projection room in their Beverly Hills home, and, if so, how much? 3. Whether petitioners are entitled to a deduction in 1967 for a loss arising from certain securities becoming worthless. GENERAL FACTS Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Beverly Hills, California, when they filed their petition herein. They filed their joint Federal income tax *266 returns for the years 1966, 1967 and 1968 with the district director of internal revenue at Los Angeles, California. 1. Palm Springs House. Petitioner George Durgom (hereinafter "petitioner" or "Bullets") began his career in the entertainment business as soon as he completed high school. He started as an advance man for orchestras and began building contacts with entertainment personalities. He came to California in 1940 with Glenn Miller's orchestra and stayed on in California with Tommy Dorsey's orchestra. He then became a personal manager with the aim of devloping his clients' talents. Among his clients at this time were Andy Russell, Dick Haines and the Pipers. In 1942 Bullets was drafted and spent approximately three years in the service, returning to California in 1945 where he again took up the business of being a personal manager to relatively unknown artists and helping them develop their talents.In 1948 Bullets acquired Jackie Gleason as a client and moved to New York to help him start his television career. While in New York Bullets acquired other clients including Trini Lopez. By 1960, when Bullets moved back to California, he had his own management firm *267 with a partner in New York. He severed his relations with Gleason, but had acquired as clients, among others, Eva Gabor, whom he placed in "Green Acres," and Alan Sherman, whom he helped to develop the album "My Son the Folksinger." During the years in issue, 1966, 1967 and 1968, Bullets was not only a personal manager but an artists' manager as well. An artists' manager is defined in section 1700.4 of the California Labor Code as follows: An artists' manager is hereby defined to be a person who engages in the occupation of advising, counseling, or directing artists in the development or advancement of their professional careers and who procures, offers, promises or attempts to procure employment or engagements for an artist only in connection with and as a part of the duties and obligations of such person under a contract with such artist by which such person contracts to render services of the nature above mentioned to such artist. He continued his partnership during the first half of 1966. Thereafter, he and his partner ceased doing business together and Bullets became an employee *268 of Ashley Famous Agency (later known as International Famous Agency or IFA). He was allowed to retain a few of his own clients outside the agency, including Eva Gabor and Trini Lopez. Bullets' responsibilities with IFA were to maintain contacts in the entertainment industry, to service existing clients and to secure additional clients. IFA reimbursed Bullets for some of his expenditures connected with these activities. However, IFA did not reimburse him for the expense of maintaining the Palm Springs house or the expenses of the business activities conducted there. Bullets believes that in show business personal contacts and personal acquaintances are very important. Consequently, entertaining and attending social functions are business to him. Many influential people in show business reside or have weekend homes in Palm Springs, including Jack Warner of Warner Brothers Studio and Frank Sinatra. To facilitate and further contacts with entertainment industry people, petitioners purchased a two bedroom "tract house" in Palm Springs. Petitioners maintained calendar books during 1966, 1967 and 1968 to record the persons whom they entertained and the dates of such entertainment *269 at the Palm Springs house. Among the entertainment personalities listed most frequently in these books were Trini Lopez, J. P. Morgan, Elizabeth Ashley, Ted Ashley, David Jansen, Jackie Cooper, Laurence Harvey, Peter Lawford, David Rose, Jack Warner, Earl Wilson, Col. Tom Parker, Paul Burke and George Peppard. Most of those mentioned did not have houses in Palm Springs and often would stay with petitioners at their house. Petitioner would often have business discussions with the above-mentioned persons in the Los Angeles area which would carry over to the Palm Springs area. Almost all visits by all guests (including overnight guests) to the Palm Springs house involved substantial, bona fide business discussions, before or after which petitioners entertained them. Bullets was highly business oriented. Neither he nor his wife had relatives in the West. All their acquaintances, and even those neighbors with whom they were friendly, were connected with the entertainment industry and Bullets' business of developing and selling talent. Petitioner Marian Durgom (hereinafter "Marian") was also at the Palm Springs house on most occasions in connection with Bullets' business activities. *270 She acted as hostess and did the cooking, cleaning and generally waited on the clients. Petitioners claimed deductions for ninety percent of expenses, including depreciation, which they incurred in connection with the Palm Springs house during 1967, 1968 and 1969. 2. Projection Room. The projection room is the main room in petitioners' Beverly Hills residence. This room was added to the original house shortly after petitioners purchased the home in 1967. The room is 1,200 square feet in area and contains a 16 millimeter movie projector, a protable movie screen, three audio tape machines, six speakers, a large bar and a pool table. The projection room is used to view films and listen to tapes made by Bullets' clients and for entertainment purposes. At times petitioner would screen television shows there. Recording artists would bring over their tapes and Bullets and they would discuss and criticize them. Many producers in the entertainment industry used this room in connection with petitioner's function as a middleman of talent. In addition, Bullets used the room to entertain business associates and producers. On the other hand, Marian also used the projection room, *271 sometimes in connection with her writing activities. Marian was working on a novel and also creating ideas for television shows during the years in issue. She earned no income from these activities during these years. Robert Morgan, petitioners' C.P.A.-business manager also consulted with petitioners concerning their personal financial affairs in the projection room. On their 1968 Federal income tax return, petitioners deducted $1,042 representing depreciation of the projection room and equipment. Respondent makes no issue of the amount claimed as the cost of the room and equipment or its useful lives, but asserts that the room and equipment was used for personal purposes, so that the depreciation thereon was not an allowable deduction. 3. Worthless Securities. In 1961 or 1962, Bullets purchased an unknown number of shares of stock of Canal Oil Company (hereinafter "Canal"). At the time of this purchase, the company was in its initial stages of organization. Petitioner received reports from the company up to and through 1964. In 1965 the reports ceased. Bullets made attempts in 1965 to locate the company but was unsuccessful. In 1966, his accountant attempted to obtain *272 information about Canal. He asked a brokerage firm for a quotation on the company's stock and the brokerage firm indicated it had no information whatsoever on the company. In 1967 petitioners claimed a $5,000 worthless securities loss with regard to this Canal Oil Company stock. OPINION 1. Palm Springs House. Petitioners contend that 90 percent of the expense of maintaining the Palm Springs house was a business expense deductible under section 162[2] and that they are entitled to deduct depreciation under section 167 on 90 percent of the adjusted basis of the house. Respondent does not dispute the applicability of sections 162 and 167, but argues that petitioners have failed to prove they meet the further requirements of section 274, specifically, that they have failed to prove that their Palm Springs house qualifies as an entertainment facility and that any of the expenses in connection therewith are deductible. We agree with petitioners. Section 162 allows a deduction *273 for all ordinary and necessary expenses incurred in carrying on a trade or business. Section 167(a) allows a deduction for exhaustion, wear and tear of property used in a trade or business or for production of income. However, section 274(a) provides that no deduction otherwise allowable under the Code shall be allowed for any entertainment expense unless the taxpayer establishes that the expense was directly related to the active conduct of the taxpayer's trade or business, or, in the case of an entertainment expense directly following or preceding a substantial, bona fide business discussion, that it was associated with the active conduct of the taxpayer's trade or business. In connection with an entertainment facility, such as petitioners' Palm Springs house, no expense is deductible unless (1) the facility is used primarily for the furtherance of the taxpayer's trade or business, and (2) the expense sought to be deducted is directly related to the active conduct of such trade or business. Section 1.274-2(a) (2), Income Tax Regs.
An entertainment facility *274 will be considered to be used primarily for business use if more than 50 percent of the total calendar days of use are for business. The facility shall be deemed to have been used primarily for business on any one day if the facility was then used for the conduct of a substantial and bona fide business discussion, notwithstanding that the facility may also have been used on the same day for personal and family purposes by the taxpayer or his family. Section 1.274-2(e) (4) (iii), Income Tax Regs.
In order to establish that a facility such as a resort home was used primarily for the furtherance of a taxpayer's trade or business, he must maintain records of the use of the facility, the cost of such use, and such other information as shall tend to establish such primary use. Such records shall contain for each business or personal use, an appropriate description of such use, including cost, date, number of persons entertained, and nature of the entertainment. Section 1.274-5(c) (6) (iii), Income Tax Regs.
Petitioners have shown that *275 the Palm Springs house was used more than 50 percent of the time for business purposes. They have met the substantiation requirements necessary to establish the primary use of the facility. Section 1.274-5(c) (6) (iii), Income Tax Regs. Petitioners kept calendars in each of the years in issue on which they recorded, substantially contemporaneously with the event, the date and the guests whom they entertained at Palm Springs, and they have established the cost of such use by records kept by their business management firm. Bullets has testified that with respect to each such guest he had a substantial and bona fide business discussion on the dates noted in the calendar for the Palm Springs house, and has explained the subject matter discussed and its business purpose and relationship. Even associated entertainment may be considered in determining whether a taxpayer has used his facility primarily for business purpose. Associated entertainment includes entertainment to obtain new business or to encourage the continuation of an existing business relationship. Section 1.274-2(d) (2), Income Tax Regs. Petitioners' calendars and Bullets' *276 oral testimony, corroborated by his wife's testimony, meet his burden of proof and establish that virtually all occasions of use of the house were for business purposes. Clearly petitioners have established that the Palm Springs house was used primarily for business purposes. The next question is whether the expenses sought to be deducted were duly established as having been directly related to the active conduct of Bullets' trade or business. The amounts deducted in each year were: 1966
1967
1968 Depreciation
$3,173.02
$3,053.00
$2,432.00
Other expenses
4,042.06
2,014.00
3,721.00
Total
$7,215.08
$5,067.00
$6,153.00
The "other expenses" were primarily expenses with respect to the facility (repairs, gardener, pool service, water, gas, electricity, etc.) and only an insignificant amount was entertainment expense (food and liquor). The substantive prerequisites for establishing that an expenditure for entertainment (including expenses for an entertainment facility) was directly related to the active conduct of a taxpayer's trade or business are *277 spelled out in section 1.274-2(c) (2), Income Tax Regs. This paragraph states that the test is met if the taxpayer can meet the requirements of any one of subparagraphs (3), (4), (5) or (6) of section 1.274-2(c), Income Tax Regs. With certain exceptions and refinements not here material, the requirements of section 1.274-2(c) (3), Income Tax Regs., are met if it is established: (i) that the taxpayer then had more than a general expectation of deriving some income or other specific trade or business benefit at some indefinite future time; (ii) that during the entertainment period, the taxpayer actively engaged in a business discussion for the purpose of obtaining income; (iii) that in light of all the facts and circumstances, the principal character or aspect of the combined business and entertainment to which the expenditure related was the active conduct of the taxpayer's trade or business; and (iv) that the expenditure was allocable to the taxpayer and a person with whom the taxpayer engaged in the active conduct of trade or business during the entertainment. The first three of these four substantive *278 prerequisites for qualification under paragraph (3) are clearly established by the credible testimony of Bullets and his wife that the Palm Springs house was used virtually exclusively as a setting for business discussions with the petitioner's clients and persons to whom petitioner was seeking to market his clients' services. Business aside, there was no meaningful personal or social relationship between Bullets and his guests.The discussions were specific, centering around particular employment possibilities for Bullets' clients. The fourth prerequisite bespeaks an "allocation" among the persons present, including Bullets, the business guests, and their spouses. Under section 1.274-2(d) (4), Income Tax Regs., portions of the expenditures allocable to Marian, or to the spouse of a client, are considered as "associated with" rather than "directly related to" the active conduct of the taxpayer's trade or business, and are therefore nondeductible. Section 1.274-2(a) (2) (ii), Income Tax Regs. An exception is made for the expenditures *279 for food and beverage, which are fully deductible under section 1.274-2(f) (2) (i), Income Tax Regs., in view of the clear showing that the expenditure was commercially rather than socially or personally motivated. Section 1.274-2(f) (2) (i) (b) and (c), Income Tax Regs. But the regulations implicitly require us to make an allocation of the depreciation and other expenses with respect to the facility. The regulations, however, are silent on whether such allocation is to be made on a pro rata or incremental cost basis. Clearly, the presence of Bullets' wife and his clients' spouses did not cause the facility to depreciate materially more rapidly, require measurable extra pool or garden service, or otherwise add measurably to the expenditures incurred. Since the facility's primary (indeed, virtually exclusive) use was for the furtherance of Bullets' business, it appears inappropriate, and an incorrect interpretation of the statutory "directly related" requirement, to allocate to Marian, or to Bullets' business associates' spouses, any part of the expenditure which would necessarily have been incurred even without their presence. Accordingly, allocating *280 the expenditures first to Bullets and his business associates on an incremental cost basis, we find that the 10 percent admitted to constitute personal use adequately covers any incidental cost increases (extra water use, etc.) which would have been occasioned by such spouses' presence. We conclude, therefore, that the substantive prerequisites are present for establishing under paragraph (3) of section 1.274-2(c), Income Tax Regs. that the expenditures were directly related to the active conduct of Bullets' trade or business. Section 1.274-2(a) (2) (ii) and section 1.274-2(c) (3), Income Tax Regs. It also appears that the Palm Springs house, used as it was virtually exclusively as a business convenience for Bullets, constituted a "clear business setting" since Bullets' guests would have reasonably known that Bullets' interest in them was professional rather than personal or social, there having been no meaningful personal or social relationship between them. Therefore, whether or not Bullets' expenditures qualified as "directly related" under section 1.274-2(c) (3), Income Tax Regs., they also so qualified *281 under section 1.274-2(c) (4), Income Tax Regs.
But compliance with the substantive requirements of section 1.274-2(a) (2), Income Tax Regs., is not enough to establish Bullets' right to the claimed deductions unless he also has complied with the evidentiary substantiation requirements of Code section 274(d) (2) and section 1.274-5, Income Tax Regs.
Section 274(d) provides that no deduction shall be allowed "for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such * * * item, (B) the * * * use of the facility, * * * (C) the business purpose of the * * * item, and (D) the business relationship to the taxpayer of persons * * * using the facility * * *." *282 Regulations section 1.274-5(c) spell out the rules for substantiation "by adequate records or by sufficient evidence corroborating" the taxpayer's own statement. To meet the adequate records requirements, the taxpayer must maintain an account book, diary or similar record and documentary evidence (like receipts), except that it is not necessary to record information in the account book or diary that duplicates information contained in the receipts. The account book, diary or similar records must be prepared at or near the time of the expenditure.In the case of the element of business purpose, where the business purpose of an expenditure is evident from the surrounding circumstances, no written explanation of such business purpose is required. Where a taxpayer has failed to meet the adequate records requirement as to any element, he must substantiate that element by his own statement, whether written or oral, containing specific information in detail as to such element, and by other corroborative evidence sufficient to establish such element. However, if such element is either the business relationship to the taxpayer of persons entertained or the business purpose of an expenditure, *283 the corroborative evidence may be circumstantial evidence. Section 1.274-5(c) (3), Income Tax Regs.
Petitioners, like so many entertainment industry people, used a business management firm. This firm paid all their bills and kept their books. Petitioners used checks for all but the most incidental expenditures, and in the case of those cash expenditures, weekly or more often mailed cash receipts (with an explanation of the expenditure) to their business manager. In 1967, however, some cash receipts from Palm Springs expenses were stapled to the Palm Springs calendar book. Robert Morgan, a C.P.A. who was responsible for petitioners' account with their business management firm and who prepared their returns for the years in issue, testified that the books and records of petitioners were kept under his direction, that all checks and cash receipts in connection with the Palm Springs house were recorded in those books and records, and that the figures used on the return were taken from those books and records. The books and records were kept contemporaneously with the payments of the expenses. Robert Morgan's testimony and petitioners' calendars duly *284 substantiate the amount of the deduction both with respect to the facility and for entertainment taken in the years in issue. The persons entertained, and the time and place of the substantial business discussions and associated entertainment have been established by petitioners' calendar books. The remaining elements, namely the business purpose of the business discussions and the business relationships with Bullets of the persons entertained rest upon Bullets' testimony as corroborated by his wife's testimony. In fact, Marian's description of her life as the wife of an artists' manager indicated that she and Bullets had no life of their own unconnected with the entertainment industry and Bullets' business. Most of her time in Palm Springs was spent waiting on his clients who came to the Palm Springs home. There remains the further question of whether this evidence adduced as to the elements of business purpose and business relationship can suffice to meet the rather rigid evidentiary requirements of section 274(d) and the regulations thereunder. Had Bullets and his wife filed separate returns, on which each spouse would have reported his or her community share of petitioner's *285 income and deductions, there would have been no doubt that in each case the evidence of the one spouse would have met the statutory corroboration requirements with respect to the deductions claimed on the other spouse's return. In such case, the marital relationship of the parties and the self-serving nature of the testimony would have merely been a matter going to the weight to be accorded their testimony, and no statutory disability would have precluded this Court from accepting such evidence, if credible, as sufficient corroboration. In fact, however, a joint return was filed, thereby raising the question whether the "taxpayer" whose unsupported statement cannot suffice without corroboration to establish a necessary element means only the individual who incurred the expense, or includes both signatories to a joint return. We find no specific guidance on this question in the statute, regulations, legislative history of section 274, or prior case law. The House Report states that "the requirement that the taxpayer's statements be corroborated will insure that no deduction is allowed solely on the basis of his own unsupported, self-serving testimony." (Emphasis added.) H. Rept. *286 No. 1447, 87th Cong., 2d Sess., (1962) 1962-3 C.B. 405, 427. While Congress did not apparently advert to the specific issue before us, the tenor of the above statement indicates to us that what was intended was to bar a deduction on one person's self-serving word alone. To bar the deduction in the teeth of the credible, albeit self-serving, testimony of two people appears to go further than Congress intended. Moreover, we believe it would be anomalous, in the absence of clear indications of Congressional intent, to make the filing of a joint return a trap for the unwary, triggering a testimonial disability not otherwise present. Generally speaking, it appears more consonant with the Congressional policy underlying the privilege of filing the joint return not to cause the exercise of the privilege to give rise to the disallowance of otherwise available deductions. Furthermore, at other points in the regulations under section 274 the term "the taxpayer" is used in a context which demonstrates that the term excludes a spouse. E.g., section 1.274-2(d) (4), Income Tax Regs. *287 In at least one place, in fact, the regulations expressly provide that the husband and wife shall for a limited purpose "be treated as one taxpayer." Section 1.274-3(e) (2), Income Tax Regs. The absence of such language in the regulations under Code section 274(d) strongly suggest the absence of such intention there. Finally, as a matter of evidentiary law, justice is more likely to be done if statutory rules prohibiting findings on the basis of otherwise competent evidence are construed no more broadly than clearly intended. 3 Sutherland, Statutes and Statutory Construction, sec. 6809, p. 340 (3d ed.), and cases cited therein. We hold, accordingly, that the "taxpayer" referred to in section 274(d) is the individual whose deduction is in question, and does not include the spouse with whom such individual may file jointly. Therefore, we find that Marian's testimony, if credible, can suffice to corroborate Bullets' on the elements of business purpose and business relationship. We were impressed with the candor and veracity of both petitioners and accept their testimony. We hold that indeed 90 percent of the expenses with respect to the Palm Springs house, *288 the limited entertainment expense, and the depreciation as claimed are deductible in the years in issue and have been substantiated as required by section 274. Almost every use of the facility noted in the calendars was an occasion of business use involving a substantial, bona fide business discussion connected with the active conduct of Bullets' trade or business of being a personal and artists' manager who advises, counsels and directs artists in the development and advancement of their professional careers and who procures or attempts to procure employment or engagements for his artists who are under contract. The limited entertainment expense involved was for entertainment which directly followed or preceded a substantial, bona fide business discussion. [3]
*289 2. Projection Room. Petitioners assert that the projection room in their Beverly Hills home and its equipment are property used solely in Bullets' trade or business, and therefore, 100 percent of the depreciation attributable to this room and its equipment is deductible. Respondent disallowed the claimed deduction for the projection room and equipment asserting that the room was not used solely in petitioner's trade or business. Whether the projection room is used solely in carrying on Bullets' trade or business is a question of fact. See Newi v. Commissioner, 432 F.2d 998 (C.A. 2, 1970), affirming a Memorandum Opinion of this Court. Based on the entire record, we find that the room is maintained primarily but not solely for carrying on Bullets' trade or business of being an artists' manager. The projection room was used for two main purposes. The first and major use was for the screening of movies and television programs and the reviewing of recordings. Pursuant to his business of being a middleman between entertainers and the buyers of the services of entertainers, Bullets was required to review and display the abilities of his clients to the buyers. The *290 projection room provided an ideal setting for this and to the extent so used the maintenance of the room is clearly used in carrying on Bullets' business. The second use of the room was for business entertaining. As was seen above, Bullets' occupation required a great deal of entertaining for him to maintain his business contacts. Moreover, as Marian testified, "everything in our life is germane to his business." However, Marian also used the room in connection with her writing activities which in the years in issue are not claimed to be a trade or business. Also Robert Morgan consulted with petitioners in this room, and some of the matters about which he consulted his clients were not directly related to Bullets' business, but concerned personal finances. Comparing the business use of the room to the total use of the room, we conclude that 80 percent of the use was connected with Bullets' business of being an artists' manager. George W. Gino, 60 T.C. 304 (1973), on appeal (C.A. 9, 12/28/73). Therefore, 80 percent of the cost of the room and of the equipment contained in it can be depreciated for tax purposes by petitioners. Since respondent does not contest *291 the cost basis or useful lives claimed by petitioner, we accept petitioners' contentions in that regard. 3. Worthless Stock. Petitioners assert that they are entitled to a deduction for the loss arising from their Canal stock becoming worthless in 1967. Respondent disallowed the deduction on the grounds petitioners have failed to prove that their stock became worthless in 1967. We agree with respondent. Section 165(g) provides that if any stock which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. In order to be entitled to the deduction, petitioners must establish that their Canal stock had value as of the beginning of the year, and that an identifiable event established worthlessness during the year. Sections 1.165-1(d) (1) and 1.165-5(c), Income Tax Regs.
Bullets claims that in either 1961 or 1962 he purchased 10,000 shares of Canal stock for $5,000 cash, that he received reports from the company through 1964, but that *292 sometime in 1965 he ceased to receive any communications from the company. Bullets' attempts to locate the company in 1965 proved unsuccessful. Robert Morgan's attempts to get a quotation on the company's stock were also unsuccessful; the brokerage firm he contacted had no information whatsoever on the company. That is all the proof we have in this case. The burden of proving the elements of a deduction for worthless securities is on petitioners, and they have failed to carry that burden. Pearl Zarnow, 48 T.C. 213, 217 (1967). Petitioners have not demonstrated that Canal had value when the stock was purchased, or if so, in which year the stock became worthless.Accordingly, we hold that petitioners are not entitled to deduct any amount in 1967 as a loss from securities becoming worthless in that year. Decision will be entered under Rule 155. Footnotes
1. Respondent disallowed $539 of a $1,372 deduction for business and professional gifts claimed by petitioners in 1967, which disallowance petitioners do not contest. In addition, the parties have agreed that petitioners are entitled to deduct $1,445 for the use of an office in their home in 1968. ↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
3. While it is this Court's role to construe and apply the Code and regulations and not to intrude its own notions as to tax policy, the extremely laborious task cut out for us by the application to the facts of this case of an almost unbearably prolix and convoluted set of regulations makes it difficult to resist the observation that the average citizen to whom these regulations are applicable could not realistically be expected to comprehend and follow them in every precise detail, if they are construed in the most rigorous possible sense. The Court has accordingly attempted to give the regulations as common-sense a construction as the rather astounding wording permits.↩